Justice Breyer,
concurring in the judgment in part and dissenting in part.
This Court need not and should not decide this difficult First Amendment issue on the merits. Rather, I believe that it should simply hold that qualified immunity bars the student’s claim for monetary damages and say no more.
I
Resolving the First Amendment question presented in this case is, in my view, unwise and unnecessary. In part that is because the question focuses upon specific content narrowly defined: May a school board punish students for speech that advocates drug use and, if so, when? At the same time, the underlying facts suggest that Principal Morse acted as she did not simply because of the specific content *426 and viewpoint of Joseph Frederick’s speech but also because of the surrounding context and manner in which Frederick expressed his views. To say that school officials might reasonably prohibit students during school-related events from unfurling 14-foot banners (with any kind of irrelevant or inappropriate message) designed to attract attention from television cameras seems unlikely to undermine basic First Amendment principles. But to hold, as the Court does, that “schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use” (and that “schools” may “restrict student expression that they reasonably regard as promoting illegal drug use”) is quite a different matter. Ante, at 397, 408. This holding, based as it is on viewpoint restrictions, raises a host of serious concerns.
One concern is that, while the holding is theoretically limited to speech promoting the use of illegal drugs, it could in fact authorize further viewpoint-based restrictions. Illegal drugs, after all, are not the only illegal substances. What about encouraging the underage consumption of alcohol? Moreover, it is unclear how far the Court’s rule regarding drug advocacy extends. What about a conversation during the lunch period where one student suggests that glaucoma sufferers should smoke marijuana to relieve the pain? What about deprecating commentary about an antidrug film shown in school? And what about drug messages mixed with other, more expressly political, content? If, for example, Frederick’s banner had read “LEGALIZE BONG HiTS,” he might be thought to receive protection from the majority’s rule, which goes to speech “encouraging illegal drug use.” Ante, at 397 (emphasis added). But speech advocating change in drug laws might also be perceived of as promoting the disregard of existing drug laws.
Legal principles must treat like instances alike. Those principles do not permit treating “drug use” separately without a satisfying explanation of why drug use is sui generis. *427 To say that illegal drug use is harmful to students, while surely true, does not itself constitute a satisfying explanation because there are many such harms. During a real war, one less metaphorical than the war on drugs, the Court declined an opportunity to draw narrow subject-matter-based lines. Cf. West Virginia Bd. of Ed. v. Barnette, 319 U. S. 624 (1943) (holding students cannot be compelled to recite the Pledge of Allegiance during World War II). We should decline this opportunity today.
Although the dissent avoids some of the majority’s pitfalls, I fear that, if adopted as law, it would risk significant interference with reasonable sehool efforts to maintain discipline. What is a principal to do when a student unfurls a 14-foot banner (carrying an irrelevant or inappropriate message) during a school-related event in an effort to capture the attention of television cameras? Nothing? In my view, a principal or a teacher might reasonably view Frederick’s conduct, in this setting, as simply beyond the pale. And a school official, knowing that adolescents often test the outer boundaries of acceptable behavior, may believe it is important (for the offending student and his classmates) to establish when a student has gone too far.
Neither can I simply say that Morse may have taken the right action (confiscating Frederick’s banner) but for the wrong reason (“drug speech”). Teachers are neither lawyers nor police officers; and the law should not demand that they fully understand the intricacies of our First Amendment jurisprudence. As the majority rightly points out, the circumstances here called for a quick decision. See ante, at 410 (noting that “Morse had to decide to act — or not act — on the spot”). But this consideration is better understood in terms of qualified immunity than of the First Amendment. See infra, at 429-432.
All of this is to say that, regardless of the outcome of the constitutional determination, a decision on the underlying First Amendment issue is both difficult and unusually por *428 tentous. And that is a reason for us not to decide the issue unless we must.
In some instances, it is appropriate to decide a constitutional issue in order to provide “guidance” for the future. But I cannot find much guidance in today’s decision. The Court makes clear that school officials may “restrict” student speech that promotes “illegal drug use” and that they may “take steps” to “safeguard” students from speech that encourages “illegal drug use.” Ante, at 397, 403. Beyond “steps” that prohibit the unfurling of banners at school outings, the Court does not explain just what those “restrict[ions]” or those “steps” might be.
Nor, if we are to avoid the risk of interpretations that are too broad or too narrow, is it easy to offer practically valuable guidance. Students will test the limits of acceptable behavior in myriad ways better known to schoolteachers than to judges; school officials need a degree of flexible authority to respond to disciplinary challenges; and the law has always considered the relationship between teachers and students special. Under these circumstances, the more detailed the Court’s supervision becomes, the more likely its law will engender further disputes among teachers and students. Consequently, larger numbers of those disputes will likely make their way from the schoolhouse to the courthouse. Yet no one wishes to substitute courts for school boards, or to turn the judge’s chambers into the principal’s office.
In order to avoid resolving the fractious underlying constitutional question, we need only decide a different question that this case presents, the question of “qualified immunity.” See Pet. for Cert. 23-28. The principle of qualified immunity fits this case perfectly and, by saying so, we would diminish the risk of bringing about the adverse consequences I have identified. More importantly, we should also adhere to a basic constitutional obligation by avoiding unnecessary decision of constitutional questions. See Ashwander v. *429 TVA, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) (“The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of”).
II
A
The defense of “qualified immunity” requires courts to enter judgment in favor of a government employee unless the employee’s conduct violates “clearly established statutory or constitutional rights of which a reasonable person would have known.” Harlow v. Fitzgerald, 457 U. S. 800, 818 (1982). The defense is designed to protect “all but the plainly incompetent or those who knowingly violate the law.” Malley v. Briggs, 475 U. S. 335, 341 (1986).
Qualified immunity applies here and entitles Principal Morse to judgment on Frederick’s monetary damages claim because she did not clearly violate the law during her confrontation with the student. At the time of that confrontation, Tinker v. Des Moines Independent Community School Dist., 393 U. S. 503, 513 (1969), indicated that school officials could not prohibit students from wearing an armband in protest of the Vietnam War, where the conduct at issue did not “materially and substantially disrupt the work and discipline of the school”; Bethel School Dist. No. 403 v. Fraser, 478 U. S. 675 (1986), indicated that school officials could restrict a student’s freedom to give a school assembly speech containing an elaborate sexual metaphor; and Hazelwood School Dist. v. Kuhlmeier, 484 U. S. 260 (1988), indicated that school officials could restrict student contributions to a school-sponsored newspaper, even without threat of imminent disruption. None of these cases clearly governs the case at hand.
The Ninth Circuit thought it “clear” that these cases did not permit Morse’s actions. See 439 F. 3d 1114, 1124 (2006). That is because, in the Ninth Circuit’s view, this case in *430 volved neither lewd speech, cf. Fraser, supra, nor school-sponsored speech, cf. Kuhlmeier, supra, and hence Tinker’s substantial disruption test must guide the inquiry. See 439 F. 3d, at 1123. But unlike the Ninth Circuit, other courts have described the tests these eases suggest as complex and often difficult to apply. See, e. g., Guiles v. Marineau, 461 F. 3d 320, 326 (CA2 2006) (“It is not entirely clear whether Tinker’s rule applies to all student speech that is not sponsored by schools, subject to the rule of Fraser, or whether it applies only to political speech or to political viewpoint-based discrimination”); Baxter v. Vigo Cty. School Corp., 26 F. 3d 728, 737 (CA7 1994) (pointing out that Fraser “cast some doubt on the extent to which students retain free speech rights in the school setting”). Indeed, the fact that this Court divides on the constitutional question (and that the majority reverses the Ninth Circuit’s constitutional determination) strongly suggests that the answer as to how to apply prior law to these facts was unclear.
The relative ease with which we could decide this case on the qualified immunity ground, and thereby avoid deciding a far more difficult constitutional question, underscores the need to lift the rigid “order of battle” decisionmaking requirement that this Court imposed upon lower courts in Saucier v. Katz, 533 U. S. 194, 201-202 (2001). In Saucier, the Court wrote that lower courts’ “first inquiry must be whether a constitutional right would have been violated on the facts alleged.” Id., at 200. Only if there is a constitutional violation can lower courts proceed to consider whether the official is entitled to “qualified immunity.” See ibid.
I have previously explained why I believe we should abandon Saucier’s order-of-battle rule. See Scott v. Harris, 550 U. S. 372, 387-389 (2007) (concurring opinion); Brosseau v. Haugen, 543 U. S. 194, 201-202 (2004) (same). Sometimes the rule will require lower courts unnecessarily to answer difficult constitutional questions, thereby wasting judicial resources. Sometimes it will require them to resolve constitu *431 tional issues that are poorly presented. Sometimes the rule will immunize an incorrect constitutional holding from further review. And often the rule violates the longstanding principle that courts should “not . . . pass on questions of constitutionality... unless such adjudication is unavoidable.” Spector Motor Service, Inc. v. McLaughlin, 323 U. S. 101, 105 (1944).
This last point warrants amplification. In resolving the underlying constitutional question, we produce several differing opinions. It is utterly unnecessary to do so. Were we to decide this case on the ground of qualified immunity, our decision would be unanimous, for the dissent concedes that Morse should not be held liable in damages for confiscating Frederick’s banner. Post, at 434 (opinion of Stevens, J.). And the “cardinal principle of judicial restraint” is that “if it is not necessary to decide more, it is necessary not to decide more.” PDK Labs., Inc. v. Drug Enforcement Admin., 362 F. 3d 786, 799 (CADC 2004) (Roberts, J., concurring in part and concurring in judgment).
If it is Saucier that tempts this Court to adhere to the rigid “order of battle” that binds lower courts, it should resist that temptation. Saucier does not bind this Court. Regardless, the rule of Saucier has generated considerable criticism from both. commentators and judges. See Leval, Judging Under the Constitution: Dicta About Dicta, 81 N. Y. U. L. Rev. 1249, 1275 (2006) (calling the requirement “a puzzling misadventure in constitutional dictum”); Dirrane v. Brookline Police Dept., 315 F. 3d 65, 69-70 (CA1 2002) (referring to the requirement as “an uncomfortable exercise” when “the answer whether there was a violation may depend on a kaleidoscope of facts not yet fully developed”); Lyons v. Xenia, 417 F. 3d 565, 580-584 (CA6 2005) (Sutton, J., concurring). While Saucier justified its rule by contending that it was necessary to permit constitutional law to develop, see 533 U. S., at 201, this concern is overstated because overruling Saucier would not mean that the law prohibited judges *432 from passing on constitutional questions, only that it did not require them to do so. Given that Saucier is a judge-made procedural rule, stare decisis concerns supporting preservation of the rule are weak. See, e. g., Payne v. Tennessee, 501 U. S. 808, 828 (1991) (“Considerations in favor of stare decisis” are at their weakest in eases “involving procedural and evidentiary rules”).
Finally, several Members of this Court have previously suggested that always requiring lower courts first to answer constitutional questions is misguided. See County of Sacramento v. Lewis, 523 U. S. 833, 859 (1998) (Stevens, J., concurring in judgment) (resolving the constitutional question first is inappropriate when that “question is both difficult and unresolved”); Bunting v. Mellen, 541 U. S. 1019, 1025 (2004) (Scalia, J., dissenting from denial of certiorari) (“We should either make clear that constitutional determinations are not insulated from our review ... or else drop any pretense at requiring the ordering in every case”); Saucier, supra, at 210 (Ginsrurg, J., concurring in judgment) (“The two-part test today’s decision imposes holds large potential to confuse”); Siegert v. Gilley, 500 U. S. 226, 235 (1991) (Kennedy, J., concurring in judgment) (“If it is plain that a plaintiff’s required malice allegations are insufficient but there is some doubt as to the constitutional right asserted, it seems to reverse the usual ordering of issues to tell the trial and appellate courts that they should resolve the constitutional question first”). I would end the failed Saucier experiment now.
B
There is one remaining objection to deciding this case on the basis of qualified immunity alone. The plaintiff in this case has sought not only damages; he has also sought an injunction requiring the school district to expunge his suspension from its records. A “qualified immunity” defense applies in respect to damages actions, but not to injunctive relief. See, e. g., Wood v. Strickland, 420 U. S. 308, 314, n. 6 *433 (1975). With respect to that claim, the underlying question of constitutionality, at least conceivably, remains.
I seriously doubt, however, that it does remain. At the plaintiff’s request, the school superintendent reviewed Frederick’s 10-day suspension. The superintendent, in turn, reduced the suspension to the eight days that Frederick had served before the appeal. But in doing so the superintendent noted that several actions independent of Frederick’s speech supported the suspension, including the plaintiff’s disregard of a school official’s instruction, his failure to report to the principal’s office on time, his “defiant [and] disruptive behavior,” and the “belligerent attitude” he displayed when he finally reported. App. to Pet. for Cert. 65a. The superintendent wrote that “were” he to “concede” that Frederick’s “speech ... is protected ... , the remainder of his behavior was not excused.” Id., at 66a.
The upshot is that the school board’s refusal to erase the suspension from the record may well be justified on non-speech-related grounds. In addition, plaintiff’s counsel appeared to agree with the Court’s suggestion at oral argument that Frederick “would not pursue” injunctive relief if he prevailed on the damages question. Tr. of Oral Arg. 46-48. And finding that Morse was entitled to qualified immunity would leave only the question of injunctive relief.
Given the high probability that Frederick’s request for an injunction will not require a court to resolve the constitutional issue, see Ashwander, 297 U. S., at 347 (Brandéis, J., concurring), I would decide only the qualified immunity question and remand the rest of the case for an initial consideration.